## Louis L. Kelly v. Obadiah A. Kelly.

*Equity—Foundation for relief — Subrogation — Equitable lien — Statute of Frauds.*

1. Complainant must abide by the case made by his bill. Neither unproved allegations, nor proof of matters not alleged, can be made a basis for equitable relief.

2. The doctrines of subrogation and of equitable lien are to prevent fraud and do justice, and should never be applied where subrogation would work injustice, or the establishment of an equitable lien would not be carrying out the intent of the parties.

3. An equitable lien upon real estate requires (1) a written contract identifying the property as security for the debt; or (2) such relations between the parties as will make it right and just to declare the lien,—as, for example, in the case of a joint owner or bona fide purchaser making improvements in good faith, or in the case of partners' liens.

4. A verbal agreement between a son and his father that if the son will pay the father's debts, and obtain the discharge of mortgages upon

his property, the father shall convey to him his real estate, is void under the Statute of Frauds, and can support no rights, either legal or equitable. If the son pays money under such a contract he can, perhaps, recover it back in assumpsit; but the payment will not create an equitable lien upon the real estate in his favor, unless rights inherent in the transaction have sprung up to support it.

5. Payment of incumbrances under an explicit verbal agreement that the incumbered property shall be conveyed to the person paying them, may be ground for subrogating him to the rights of the incum-brancers to the extent of the payment, but subject to such rights as may have arisen meanwhile.

6. The mere expectation of an inheritance cannot constitute any such consideration for the payment of incumbrances thereon, that the fear of having this expectation disappointed by the possible advent of other heirs can be made a ground for subrogation to the liens discharged.

Appeal from Washtenaw. (Joslyn, J.) April 29.—June 4.

BILL to establish lien. Defendant appeals. Reversed.

*E. D. Kinne* for complainant.

*Noah W. Cheever* and *Sawyer & Knowlton* for appellant.

CHAMPLIN, J. The bill of complaint states that on the 31st day of December, 1877, and for a long time prior thereto, defendant was the owner of three several parcels of land, particularly described in the bill, of the aggregate value of three thousand dollars; that he was deeply involved financially, and the lands incumbered by mortgages, one of two hundred dollars, one of three, and one of five hundred dollars, all held by Luther James of Ann Arbor, Michigan, which covered two of the parcels of land, and the other parcel was subject to a mortgage of one hundred dollars, held and owned by a Mrs. Smith. One parcel of the land has a dwelling thereon, and is situated in the city of Ann Arbor, and the other parcels lie just outside the corporate limits of the city. That he was owing unsecured debts, as follows: To Gilbert E. Johnson, $1000; Mr. Antler, $115; Ann Arbor Savings Bank, $50; and to complainant, $100. That he was somewhat advanced in years and broken in health,

and was unable to pay these debts. "That on the 31st day of December, 1877, as aforesaid, the said defendant made an oral agreement with your orator, wherein and whereby it was agreed, understood and contracted that your orator should assume and pay off all the then existing indebtedness, of whatsoever name or nature, which was, or then might be, existing and outstanding against the defendant, including the incumbrances upon the aforesaid lands, and that, in consideration therefor, the aforesaid lands should then become, and thereafter be, the property of your orator. And it was agreed and understood that whatever was necessary to be done in the way of legal transfers to effect the arrangement would be done at the seasonable time."

The bill then alleges: "That in consideration of the assumption and payment of said indebtedness by your orator, the said lands should become, and did then and there become, the absolute property of your orator, with the right and power either to sell and convey said lands, and therefrom liquidate the aforesaid indebtedness, or to retain said lands as his own, and pay the said indebtedness, or to make such other or different disposition of said lands as to your orator might seem proper; provided your orator assumed and paid all of the aforesaid debts and incumbrances."

He then states that he at once entered upon the performance of his contract obligations, and then and there assumed the payment of the indebtedness to Gilbert E. Johnson "by executing his own note, *signed* by *the defendant,* and delivering the same to said Johnson," which he paid on August 21, 1880, amounting, with interest thereon, to $1189; that in the month of October, 1877, prior to said agreement, he paid, at defendant's request, interest upon the James mortgage, amounting to $110, and in October, 1878, he paid to Luther James interest amounting to $120. In May, 1879, he paid upon the James mortgage $300, and in March, 1880, he paid the balance due to Luther James of $371.86, and thereupon the five hundred dollar mortgage was discharged; that in November, 1879, he paid the principal and interest due on the Smith mortgage, amounting to $118.50, and

caused the same to be discharged; that in the summer of 1879 he paid to Mrs. Antler the amount of defendant's note held by her, of $115, and another note to the Ann Arbor Savings Bank, of $50; that he has fully performed his part of the agreement, and liquidated the entire indebtedness against defendant, except the payment of the mortgages, amounting to five hundred dollars, held by Luther James; that he is ready and anxious to pay said mortgages, *and would have done so long before*, had he not felt apprehensive of the conduct of the defendant, "lest he should be jeopardized in the security in the sums of money already advanced, and any sum thereafter advanced."

It is stated in the bill that defendant continued to reside on these lands until about the first of January, 1879, when he came to live with complainant at Farwell, Clare county, Michigan, and so continued to live at Farwell until about May 1, 1880; that in February, 1879, defendant's wife died at Farwell.

The complainant proceeds to state the conduct of the defendant which caused him to feel apprehension lest he might be jeoparded in his security, as follows: "That defendant, some four months since, intermarried with a young woman of some twenty-three years of age, and from the time of such marriage has lived apart from your orator; that since his marriage he has manifested a different spirit toward your orator, and has sought to repudiate the agreement made between them as hereinbefore set forth; that your orator, becoming alarmed lest his moneys as aforesaid advanced might be endangered or lost, and discovering a disposition on the part of the defendant to ignore said agreement, your orator asked and urged the said defendant to complete the arrangement and understanding so as aforesaid entered into between them, and to that end to execute a deed of conveyance of said lands to your orator in pursuance of such contract and understanding, but the said defendant has and does utterly refuse so to do; that your orator, finding that the defendant was unwilling to convey the said premises to your orator, urged him to deliver to your orator a mortgage upon the

lands as security for the money so advanced by your orator
to the defendant as hereinbefore set forth, or in some other
manner to secure your orator the said sums of money so
advanced, but the said defendant refused so to do, or to make
any arrangement whatever with your orator for repayment,
security or conveyance, and on the other hand occupies a
hostile attitude toward your orator."

The relief prayed for is, 1st. That defendant be required
and compelled to make, execute, and deliver to complainant
a good and sufficient deed of conveyance of said lands; or 2d.
That complainant's title and estate therein may be adjudged
and decreed to be perfect and complete as of the 31st day of
December, A. D. 1877; or 3d. That he be compelled to deliver
to your orator ample and satisfactory security for the prompt
repayment of the said sums of money as aforesaid advanced;
or 4th. That complainant be decreed to have an equitable
mortgage upon the said premises for the moneys advanced,
and a sale thereof for the sums to be decreed; and a prayer
for general relief.

Defendant answered under oath, denying the agreement set
up in the bill, and giving a family history at length. Proofs
were taken, and the court below entered a decree which is
entirely silent as to the existence of the agreement set forth
in the bill, but asserts that, it appearing to the satisfaction of
the court that complainant has advanced and paid, at the
request of defendant, $931.32, upon three certain mort-
gages named in the bill, covering the two parcels first described
therein, and the further sum of $118.50 on the second parcel;
and that complainant is justly and equitably entitled to be
subrogated to the rights of the mortgagees for all payments by
him made upon said mortgages, and to a lien upon said lands
for the payments so advanced; and decreeing that the respec-
tive sums be just, legal and valid liens upon the lands which
had been incumbered by the mortgages paid, and that in
default of payment by defendant by a certain day therein
named, the lands be sold by a circuit court commissioner,
and the moneys applied to payment of complainant, and the
surplus, if any, be brought into court to abide its further

order. It was further decreed that the lien established upon the premises by the decree should stand and have priority over all liens and incumbrances except those existing on the 31st day of December, 1877. From this decree defendant appealed; and, as complainant has not appealed, he is presumed to be satisfied with the decree entered below; and the only question for our consideration is whether the decree pronounced ought to stand.

The proofs in the case are quite voluminous. The parties are son and father respectively. The father was a man of limited means. He had formerly lived in Vermont, where he carried on a photographer's business, and many years ago had removed to Ann Arbor, where he engaged successively in the photograph, grocery, milk and concrete sidewalk business. His family consisted of his wife and three sons, of whom complainant was the youngest. He had educated the two eldest sons at the University, which took about all he could earn at the time. Both of these sons are dead. The complainant attended the Union school until he was about fifteen years of age; then assisted his father until he was twenty-one. At nineteen he attended the Normal School and prepared himself for teaching. Soon after he was twenty-one he married and brought his wife to his father's, where they resided in the family. It seems to have been the desire of the father to give to this son a university education, and he proposed that he should take a regular literary course, but the son objected, saying it would take him six years to work through; but if it could be arranged so that himself and wife could be supported in the mean time, he would like to go through the Medical Department of the University. The father was in straitened circumstances and in debt. The mortgage incumbrances set up in the bill were then existing, and he owed one Gilbert E. Johnson, a nephew, nearly $1000 for money he had borrowed to send his other sons through school.

The father testifies that at this time it was arranged between him and his son that he and his wife should live with him, and he would support them and aid the son to pass through the Medical Department and to start in business, and after he

should get established in business and was able to do so he
should assist him, the father, in the payment of his debts.
This was in 1872, and the son was then twenty-two years of
age.   He entered the Medical Department of the University,
and graduated in the spring of 1875.   The father assisted him
during the time, and during the vacations he assisted his
father.   Their relations appear to have been of the most
friendly character, and mutually satisfactory.   After gradu-
ating he located at Farwell, Clare county, where he soon
established a good business.   The father continued to aid
him in various ways, sending him fruit, vegetables, butter,
etc., and he in turn assisted his father by sending him money,
and in October, 1877, he paid interest upon the mortgage
incumbrances to the amount of $110.   In December, 1877,
the parents made a visit to their son at Farwell, and it was
during this visit that the complainant claims the agreement
was made which he sets up in the bill of complaint.   The
immediate occasion, as he claims, of this agreement being
made at that time was a visit from Gilbert E. Johnson, above
referred to, who says he was well acquainted with the financial
condition of defendant, and had often been consulted by him
in reference to his business affairs.   He had left his residence
in Vermont and gone to Ann Arbor, expecting to find defend-
ant there, to make some arrangement about the payment of
such indebtedness.   He followed him to Farwell.   There he
learned that the son was well established in business, with a
good prospect before him, and he was not slow in coming to
the conclusion that a note signed by the father and the son
would place him in a position where he could reasonably expect
the indebtedness to him would be paid in a short time.   He
says he preferred such a note to security upon defendant's
real estate, incumbered as it was.

Johnson is the main witness by whom complainant seeks
to establish the contract set forth in the bill.   He claims to
have been present at the time it was made.   He says it was
on the last day of December, 1877, and grew out of his ask-
ing defendant for pay or security upon his note.   He is not
willing to admit that he requested a note signed by the father

and son, but says he talked it up with defendant, and that the father said that he did not know whether his son would sign with him, but would ask him. Johnson told the defendant if the son Louis would sign with him, he would reduce the note from ten to seven per cent., and they might let it run until it was convenient to pay it. Later in the evening of the same day he says the agreement was made, concerning which he testified as follows:

"*Question.* Was it at that time, if at all, that an arrangement was made between Louis and his father in reference to the property and the payment of the defendant's debts?

*Answer.* Yes; there was a general discussion of this whole matter during half an hour; perhaps more. It was finally arranged that Louis should sign this note and his father should transfer the property to him.

*Q.* Were you present at that time?

*A.* I was.

*Q.* Who was present?

*A.* Obadiah, the son, and myself.

*Q.* What was the agreement as you heard it between the father and son?

*A.* The father proposed to let him have the entire property. They talked about all this indebtedness; he had talked with me about it before. That was a matter I was interested in. Of course, if I took this mortgage I had to take all these other mortgages that was taken. There was a discussion of the whole matter,—the amount, etc.,—and finally he said if Louis would assume this indebtedness and pay it,—that Louis was in shape to pay it, or would be,—he could not say but Louis would be able to raise it while I was there. Before this he had said that Louis wanted to keep the home place, and he presumed Louis would step in and do something for that reason, and he proposed to let Louis do as he pleased with it. Louis then said he would like to keep it—the homestead—if he could. Perhaps they would want to come back here, and perhaps he would want to make it a home, and if he could keep the homestead he would like to do that, but did not know how he could get along. He had just commenced. His father told him he might go on and do just as he pleased. He would at any time deed the property to him, or whoever he might say. He would leave the whole matter in Louis' control to do as he pleased, provided he paid up his father's debts.

*Q.* What arrangement was made with reference to Louis taking care of the indebtedness of the old gentleman?

*A.* He was to do it; the old gentleman made that proposition; they figured it up in the neighborhood of $2500; I cannot tell exactly; it included everything; I think they talked up everything that I have heard mentioned here to-day; he might sell the property, if he saw fit, to pay these debts, or he might retain the property and pay them; he might do as he pleased; he said at any time he would deed the property to him or anybody else; Louis might keep it himself or do as he had a mind to.

*Q.* Was that agreement finally consummated between them?

*A.* It was finally consummated between them."

The witness further testified that on the same evening a note was drawn up, payable to him, and signed by both father and son. On his cross-examination he testified that defendant agreed that the property should be Louis' *on the payment of these debts.* He further testified on cross-examination as follows:

" *Question.* You may now state, if you will, the conversation between Mr. Kelly and his son from the time Mr. Kelly asked his son to sign this note with him up to the time of signing the note.

*Answer.* The conversation between the two?

*Q.* Yes, sir.

*A.* It was quite a lengthy conversation; it would be impossible to repeat anywhere near all of it. A large share of it related to going into business there, moving his family from Ann Arbor, and going into business with his son, arranging their business together.

*Q.* Let us know what about that; state what was said between them there about it.

*A.* The old gentleman said he thought he would better move to Farwell and go into the drug business,—build a store; he thought he could help Louis and Louis could help him in the business, and thought it was advisable on the part of both to go into business together; he was all they had, and thought they ought to be together. They had a long conversation in a general way about their mutual interests in this matter that I do not remember.

*Q.* I would like to have it.

*A.* It was in a general way, and suggestions were made on

both sides as to what they would better do. I cannot remember.

Q. What were the interests mentioned?

A. It was talked in this way: that Louis was all the child they had, and his mother wanted to live with Louis, and he wanted to, and all they had was really one consolidated interest, and he thought they would better go into business there,—thought they had better sell the Ann Arbor property.

Q. The old gentleman did?

A. Yes, sir.

Q. His mother and Louis thought they would better sell the Ann Arbor property and go into business up there?

A. Yes, sir.

Q. Proceed.

A. Louis all the time seemed to want to sell the rest and keep the homestead; thought he could get along well enough and do it; rather thought they could put up this store and go into business without selling the homestead; at any rate, they could if I would let this matter run along. I think the matter was talked, if I could at any time get the money and let the security go along. I had money,—this refreshes me in reference to the money matter,—Louis and his father were in the office. Nothing was said, individually, by Kelly, the father, in reference to consolidating their interests; it was all together.

Q. I ask, what was said about joining their mutual interests?

A. I have told you the substance of it.

Q. That conversation was before the note was given?

A. It was just before, or it was just after the note was given; it was all done between 10 and 12 o'clock. I could not tell whether it was just before or just after; it was in that evening.

Q. That is, this conversation about having consolidated interests, and that what was the old gentleman's was or would be Louis'?

A. Yes, sir.

Q. And they ought to sell this property and go up there, pay their debts, and go into business and help each other?

A. Yes, sir.

Q. That was either just before or after signing this note?

A. Yes, sir.

Q. And the signing the note was the closing of the arrangement between them?

*A.* Yes, sir; I think it was. They came to a general understanding every way before the note was signed; I think so.

*Q.* Among other things it was said that the father was to live—the families were to live together?

*A.* Yes, it was expected they would, I should judge from the conversation.

*Q.* And the father would live with Louis?

*A.* Yes, sir.

*Q.* And connected; a sort of consolidated interest, as one solid family?

*A.* Yes, sir.

*Q.* All interested in the same property, and the same business, and in each other?

*A.* Yes, sir.

*Q.* That was about the result of the contract, and about the end of it?

*A.* Yes, sir."

This witness also testified that he supposed that Louis must be owing his father for supporting him and wife while he was going through college, and that Louis ought to be willing to sign the note because he was owing his father.

The complainant was sworn in his own behalf, and testified with reference to the interview of December 31, 1877, when his cousin Gilbert E. Johnson was present, and to the agreement then made. He says the conclusion was that he was to pay the indebtedness and have the property. He does not testify to any consolidation of interests or mutual efforts in carrying on business; but when asked by his counsel what arrangement, if any, was made with regard to his father living with him, and what was said, if anything, about that, he replied : " The talk was that it would be less expense to live with me, and pleasanter for him, so they talked of coming there." On cross-examination he testified as follows :

" *Question.* He had then, had he not, agreed to give you every dollar he had at that time if you would pay his debts ?

*Answer.* He agreed to give me his property.

*Q.* Had not he agreed to give you every dollar of his property if you would pay his debts?

*A.* I don't know as he did.

*Q.* If he had a cent left tell me what it was?

*A.* He agreed to give the property to me.

*Q.* Tell me what it was if he had anything left at that time?

*A.* I don't think he had anything left unless it was household property.

*Q.* Then your father was under your control, too, at that time, wasn't he?

*A.* He acted as agent when I told him to rent the place.

*Q.* He did not have any support unless you gave it to him?

*A.* He did what he could, and what he lacked I made up.

*Q.* That is to say, that if he could not earn a living, after he gave you all the property, you gave him a living?

*A.* I did not propose to see my father suffer.

*Q.* He agreed to give you all the property he had, and support himself if he could, and if he could not you would help him; was that the agreement?

*A.* He agreed to give me the property to pay his debts.

*Q.* And help himself if he could?

*A.* There was no special agreement. The talk was that he was to come and live with me.

*Q.* Was there any agreement with your father that he should be supported by your money?

*A.* There was no agreement.

*Q.* He gave you all his property if you would pay his debts?

*A.* Yes, sir.

*Q.* And his property was worth about $1000 more than his debts?

*A.* I don't think it was worth any more.

*Q.* Are you under any obligation to support your father if he should give you his property as you understood the contract?

*A.* Not according to the contract. I think every son should support his father.

*Q.* I am not talking about that; I am talking about the contract. Answer my question, whether, under the contract, you were under any legal obligation to support your father?

*A.* There was no contract to support father."

He further testified that the note given at that time to Gilbert E. Johnson was as follows:

"$1000.          FARWELL, Mich., Dec. 31st, 1877.

For value received we promise to pay Gilbert E. Johnson or order one thousand dollars, on demand, with interest at seven per cent. per annum annually.          LOUIS J. KELLY.
                                                      O. A. KELLY."

—and that the body of the note was written by him.

It further appears that in 1878 there was paid upon the defendant's indebtedness $500, and in 1879, $233.50, and March 24th, 1880, $371.73; the whole of which amounts the son claims was paid by him. The father claims that these sums were not wholly paid by the son, but that he assisted, and that his money, or the avails of his property, was used to make up the amount. It is quite clear, however, that quite the larger part, if not all, of this money was furnished by the son, and that the Smith mortgage on the homestead and one of the James mortgages, amounting to five hundred dollars were paid in full and discharged of record; and of the unsecured indebtedness, the Antley note of $115, and the note to the Savings Bank, were also paid.

The foregoing constitute the total amount of indebtedness that had been paid at the time of the filing of the bill, at which time there remained of the secured indebtedness unpaid the two mortgages held by James, and of the unsecured the joint note to Johnson. In December, 1878, the defendant leased his property at Ann Arbor, and, together with his wife, removed to Farwell, and there resided with complainant as one family. In February, 1879, defendant's wife died. He still remained a part of the family up to May, 1880. During this time defendant assisted complainant in attending his office, caring for the horses, and in logging and clearing up about eighteen acres of land. There had been talk of selling the Ann Arbor property and building a drug-store at Farwell with the avails; but the arrangement had not been consummated. It may be noted here that it appears from defendant's testimony, as well as from that of Mrs. Kelly, the wife of complainant, that there never existed between them a very cordial feeling; that defendant was opposed to his son's marriage, but always treated his wife civilly, more on account of her being his son's wife than of any regard for her.

We now come to the cause of all the trouble and the consequent rupture of the confidential and pleasant relations between the father and the son. About the first of May, 1880, defendant married a young lady of twenty-three, as

alleged in the bill of complaint. This change in the family relations alarmed complainant, "lest his moneys so as aforesaid *advanced* might be endangered and lost." In this emergency he sought the aid of an attorney at Farwell, who, at complainant's request, interviewed the defendant, not as a retained attorney for the complainant, but, as he testifies, merely "as a pacificator." In this interview he says he told the defendant that the doctor was considerably excited, and there would be trouble about this matter, and he would better try and fix it up with the doctor, and wanted him to go and see the doctor. He told him that the doctor claimed that he had paid between $2300 and $2400, and he had better fix it; that he had better transfer his property to the doctor, or secure him and take a life-lease. The defendant testifies that this interview was the first intimation he had of any trouble whatever between his son and himself. He says that the attorney and complainant were both present, and wanted he should go with them to the attorney's office and secure Louis for what he had paid out, and what he had done for defendant, by giving a deed of everything he had; that he told them he would not do it; that he would meet Louis at any time, and he might bring in everything he had paid for him, and then double it, and if he (defendant) had not paid it, he would before he slept. They wanted to know what he had done, and about this putting him through college, and the use of the horses, and that he told them that he had furnished him horses ever since he had been there; that the attorney made the remark that he would buy the horses, and that he (defendant) told him he had not got any horses to sell,—did not care to sell them.

Complainant testifies that upon another occasion he requested his father to give him a deed of his property, or secure him for the debts he had paid, and he refused to do so, giving as a reason that he did not think it prudent; that complainant's wife might influence him against defendant, and he (complainant) might "shove him out." Soon after this defendant was taken quite ill, which fact was known to complainant and he did not call to see him, giving as a reason

that if any person was sick and wished him to call and see them they must send for him, and giving as a further reason that the people where his father was lying ill were unfriendly to him. On another occasion—whether before or after the commencement of this suit does not appear—the defendant went into complainant's office to make a demand of some personal property defendant claimed complainant had of his, when his son ordered him to leave the office, and, on his not obeying as soon as he desired, he took his father by the ear and lifted him from his chair for the purpose of ejecting him. We make no comment upon this transaction. The son, in giving his testimony, admits, what no person will deny, that he ought not to have done it, and gives as his only excuse that he was in a passion, and in haste to lock his office, in order to leave on the cars to attend a professional call at Clare. The occurrence would seem to justify the father's apprehension that it would not be prudent for him to deed to his son all his property, through fear that he "might shove him out." Just prior to the commencement of this suit, Gilbert E. Johnson was called to Farwell by the son. He came and endeavored to reconcile the parties, but was unable to do so. He then made an arrangement with complainant by which complainant exchanged his own note for the joint note of December 31, 1877, amounting at that time to $1189. This would indicate that this transaction occurred on the 12th of August, 1880, and that no interest had been paid up to that time.

We have now reviewed all the testimony which we deem pertinent to the determination of the question involved, as to whether complainant is entitled, under the pleadings and proofs, to an equitable lien upon the premises described in the bill, or to be subrogated to the rights of the mortgagees for the amount of moneys paid by him to effect their dis-charge. The sole ground of relief upon which the bill is predicated is contained in the third paragraph, as follows:

"That on the 31st day of December, 1877, as aforesaid, the said defendant made oral agreement with your orator, wherein and whereby it was agreed, understood and con-

tracted that your orator should assume and pay off all the then existing indebtedness, of whatsoever name or nature, which was or then might be existing and outstanding against the defendant, including the encumbrance upon the aforesaid lands, and that, in consideration therefor, the aforesaid lands should then become, and thereafter be, the property of your orator. And it [was] agreed and understood that whatever was necessary to be done in the way of legal transfers to effect the arrangement, would be done at the seasonable time.

That in consideration of the assumption and payment of said indebtedness by your orator, the said lands should become, and did then and there become, the absolute property of your orator, with the right and power either to sell and convey said lands, and therefrom liquidate the aforesaid indebtedness, or to retain said lands as his own, and pay the said indebtedness, or to make such other or different disposition of said lands as to your orator might seem proper; provided, your orator assumed and paid all of the aforesaid debts and encumbrances."

And he must stand or fall on the case made by the bill.

Allegations without proof, and proof without allegations, are alike unavailing as a basis for equitable relief. The agreement set out in the bill, when fairly construed, makes the payment of all the debts a condition precedent to the conveyance of the property to complainant. Such is the effect of the proviso. There is no allegation in the bill that in case of payment there should exist any equitable lien in favor of complainant, or that he should be subrogated to the rights of the mortgagees. On the contrary, the debts were to be assumed and paid, and as a necessary inference, the liens existing were to be discharged. Passing for the present the question of the validity of the alleged contract, we are satisfied that the proof wholly fails to sustain the allegations of the bill.

That complainant did pay certain of defendant's debts there can be no doubt. But under what arrangement it was done does not satisfactorily appear. Whether such payments were made upon the understanding testified to by defendant, to the effect that Louis agreed to do so in consideration of

his assisting him through the Medical Department of the University, or whether it was under the later arrangement, as testified to by Johnson on his cross-examination, as the result of what was said when he took the joint note, that what he had was or would be Louis', as he was the only child, and that they had better sell the Ann Arbor property, pay up the debts, and go into business and help each other at Farwell, is left from the testimony in a state of doubt and uncertainty. There is testimony favoring both of these views. The payment by complainant of the interest on the incumbrances prior to December 31, 1877, and the assistance rendered by defendant by sending produce, etc., prior to that date, supports the defendant's statement; while his renting his place at Ann Arbor and removing to Farwell, and uniting his efforts with those of his son in business matters, corresponds with the testimony given by Johnson in reference to the consolidation of their interests. The testimony of Johnson, as modified by him on cross-examination, leaves the complainant's statements entirely unsupported by any reliable testimony.

It is presuming upon our credulity to ask us to believe that the father should agree to convey all his property to his son except his household goods,—worth considerably more than his indebtedness,—on the bare assumption that the son should pay all his debts at that time existing, with no agreement as to future support of himself and wife. If the contract was made as alleged, by what principle of equity has the complainant the right to the relief prayed for, without full performance on his part? He engaged to pay all the debts, and he has stopped far short of performance. There remain two mortgages upon the land unpaid, the principal of which amounts to $500. This appears from the bill. The note of $1000 he claims to have paid by giving his own note in exchange, but when on the witness stand he stated that he still held this note of $1000, and had never offered to give it up to his father, and, under advice of his counsel, he refused to say that his father might have it then. He has not been prevented from performance by defendant, and yet,

without fulfilling his part of the alleged contract, or showing any good reason why he does not do so, he asks that defendant be compelled to perform his part thereof, the effect of which would be to make a new and different contract from that which complainant claims the parties had agreed upon, and to relieve the complainant from the obligations he claims to have assumed, and to restore the liens which he had undertaken to discharge. It is only to prevent fraud and subserve justice that equity engrafts the wholesome provisions of subrogation or of equitable lien upon a transaction; and it should never be done where it would work injustice. To subrogate complainant to the rights of the mortgagees of the mortgages discharged, or to engraft an equitable lien upon the property, would not be carrying out the intent of the parties to the contract set up in the bill. That looked to the payment and extinguishment of the debts and the discharge of the mortgages. What justice is there in replacing the liens in favor of complainant and thus relieving him from the performance of the contract on his part?

There are other reasons why the complainant is not entitled to the relief prayed for. In order to lay the foundation for an equitable lien upon real estate there must exist—*first*, a contract in writing out of which the equity springs, sufficiently indicating an intention to make some particular property, therein identified, a security for the debt or obligation, or whereby the party promises to convey or assign or transfer the property as security. Pom. Eq. Jur. §1235. The intent to give security being clear, equity will treat the instrument as an executory agreement to give security. In the case before us there is no agreement in writing, and there is nothing in the verbal agreement which indicates an intention to give security. Or *second*, in the absence of such contract, where, from the relations of the parties, equity will declare a lien out of considerations of right and justice, based upon those maxims which lie at the foundation of equity jurisprudence. Such are the cases when one joint owner, acting in good faith, and for the joint benefit, makes permanent improvements upon the property which add a permanent value

to the estate; or when a party, innocently and in good faith, supposing himself to be the owner, makes permanent improvements or repairs, which permanently enhance the value of the property, the real owner, when he seeks the aid of equity to establish or enforce some equitable right or claim to the property, upon the principle that he who asks equity must do equity, will be required to pay the amount expended. So with regard to what are known as partners' liens. But in all such cases the foundation for relief must be laid in the bill, and the complainant must set out such a state of facts and circumstances, and prove them on the hearing, as shows that in equity and good conscience he is entitled to the relief prayed for. That has not been done in this case. The complainant sets forth no case except of a verbal contract broken, or at least not performed by himself, and he does not make a case by his proofs which calls for equitable interposition. The contract set out, being void under the Statute of Frauds, cannot be used as the foundation of any legal or equitable right. If a party pays money under such a void contract he may recover it back in assumpsit, but a court of equity will not create a lien upon real estate in favor of the party paying unless, from the nature of the transaction rights have sprung up which ought to be held binding upon the specific property.

Complainant's counsel insist that the complainant paid these moneys and assumed these liabilities on the strength of the promises of defendant that these lands were complainant's, and that the formal transfer should be made whenever he wished it; and that complainant is entitled to an affirmance of the decree pronounced below, upon the doctrine of subrogation. In no event, however, could such a claim be maintained with respect to the money paid prior to December 31, 1877,—the time it is claimed the contract was made. If we were satisfied from the testimony that these mortgages were paid off in pursuance of the contract, as complainant claims, and because of an unwillingness or refusal to perform, on the part of defendant, on account of its illegality, or because of an unexpected change in the family relations,

which interfered with or prevented the contract from being carried out according to the original intention of the parties, we should feel like granting the relief so far as to subrogate him to the rights of the mortgagees to the extent of payments made under such contract, subject to such rights as may have attached in the mean time. But the difficulty in the way of granting such relief is that we are not satisfied, from all the evidence in the case, that the contract set up in the bill was agreed upon between the parties; or that the payments made were made under that contract; or whether they were made, as the one prior to December 31, 1877, was made, in pursuance of some agreement or understanding that complainant should assist in paying these debts, in consideration of benefits received in obtaining and getting started in his profession. It may be that he expected to inherit the property, and that may have operated as one inducement to pay them, as seems to be shadowed forth in the testimony of Mr. Johnson; but if that were the case, it would form no basis for a subrogation founded upon an alarm occasioned by the second marriage, that there might exist a potentiality of other heirs arising to question his inheritance.

We think that the decree below should be reversed, and one entered here dismissing the bill of complaint, with costs of both courts.

The other Justices concurred.